h COOKS, J.
dissenting.
I respectfully dissent from the majority opinion and agree with the finding of the trial court, who stated:
Mr. Marcotte, then got up on the stand and began to testify and then Mrs. St. Romain testifies and low and behold their stories don’t match. They tried to get them to match. They match about one thing. That they weren’t having sex. They didn’t match about anything else.
Mr. Marcotte said he was working on the camp the night of the pictures because he was moving into the camp. Mrs. St. Romain said she was moving into the camp, so does that mean that they were moving in together or does *680 that mean that they were mistaken as to getting their stories straight.... But once they got up here and told different stories ... then I look at circumstantial evidence as Judge Piazza said has every reasonable hypothesis been excluded to indicate that more probable than not Thomas Marcotte and Laura St. Romain were involved in a physical relationship prior to April 11th, 2003 and the answer in a resounding, yes. I mean my goodness if it was not they’d be today admitting what was going on and everything would be fine and dandy and this case would have been over twenty minutes ago. That’s the finding of the court.
When proving adultery, the court, in Breaux v. Breaux, 323 So.2d 486 (La.App. 1 Cir.1975), stated:
Circumstantial proof of adultery requires production of indirect or circumstantial evidence, which fairly and necessarily justifies and supports the conclusions that adultery was committed. The degree of proof of adultery by circumstantial evidence is similar to proof of guilt in a criminal proceeding and in that the evidence must establish guilt of the party accused to the exclusion of any other reasonable hypothesis.
Id. at 488.
The telephone records produced at trial document numerous telephone calls 12between Mr. Marcotte and Mrs. St. Ro-main during the months prior to the separation and filing for divorce. Additionally, Mr. St. Romain testified Mrs. St. Romain came home one day with a “hickey” on her neck. He testified as follows:
She had a hickey on her neck and I confronted her with who had done it and she says don’t worry who did it. She says any man can suck on my neck and it’s her business. And I asked her if it was Mr. Marcotte and she said so what if it is.
Mrs. Marcotte testified she photographed her husband and Mrs. St. Romain in her husband’s truck parked at Mrs. St. Romain’s camp about midnight one night. Although this incident occurred after the April divorce filing, Mr. Marcotte and Mrs. St. Romain told conflicting stories about the circumstances surrounding their presence at the camp at midnight. Additionally, Mrs. Marcotte testified while her husband was still living at home, a woman would call their home and her husband would “just take off and run like he lost his senses. This would happen around four, 4:15, 4:30 in the afternoon, sometimes later.”
Mr. Marcotte testified at trial and denied causing the hickey on Mrs. St. Ro-main’s neck. He denied having a sexual relationship with Mrs. St. Romain even after his divorce and insisted he and Laura are “just friends.” When questioned about the night at the camp, he testified:
I was, at that time, Carolyn and I were separated. Laura had offered me to stay at the camp to rent and we was out there ... I was out there doing some plumbing work, she had leaks, she had mice in there. I was closing up the holes underneath the camp and she would cook something to eat and we was on our way back.
Mrs. St. Romain testified she and Mr. Marcotte are “very good friends” and they speak daily on the telephone. She denied having a sexual relationship with him before or after her divorce. When questioned about the night at the camp, her story differed from Mr. Marcotte’s. She testified:
I asked him [Mr. Marcotte] to come and check out a stove that | ^didn’t work, that I couldn’t get to work because I thought I’d probably be moving *681 there.... I don’t think it was that time. I think it was about eleven o’clock at night. That we went and we built a campfire, we cooked out there.
I would find the circumstantial evidence (i.e., the numerous telephone calls, the “hickey” on Mrs. St. Romain’s neck, the presence at the camp after midnight, the conflicting testimony between the parties, the unbelievable denial of a sexual relationship even after the divorce) “fairly and necessarily justifies and supports the conclusions that adultery was committed.” Breaux v. Breaux, 323 So.2d at 488. Therefore, I respectfully dissent from the majority opinion.